Filed 11/16/20  P. v. Short CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE, | B293373 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA084722) |
| v. | |
| KIRK MARSHALL SHORT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan M. Speer, Judge.  Affirmed and remanded with directions.

Robert E. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Kristen J. Inberg, Deputy Attorneys General, for Plaintiff and Respondent.

——————————

Kirk Marshall Short appeals from a judgment entered after a jury convicted him of battery causing serious bodily injury and assault by means of force likely to produce great bodily injury. The jury found true as to the assault that Short personally inflicted great bodily injury upon the victim.

On appeal, Short contends the trial court erred in revoking his *Faretta*[1] right to represent himself at trial. He also argues there was insufficient evidence to support the trial court's determination he was competent to stand trial. Further, Short asserts a limited remand is appropriate for the trial court to hold a mental health diversion eligibility hearing pursuant to Penal Code[2] section 1001.36. In addition, Short requests we remand for the court to exercise its discretion under Senate Bill No. 1393 (2017-2018 Reg. Sess.) to decide whether to strike the five-year enhancement the court imposed pursuant to section 667, subdivision (a)(1). Short also contends, the People concede, and we agree under Senate Bill No. 136 (2019-2020 Reg. Sess.), the two 1-year prior prison term enhancements imposed under section 667.5, subdivision (b), must be stricken. Finally, Short requests we remand for the trial court to conduct a hearing on his ability to pay the court assessments and restitution fines pursuant to this court's opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We affirm the judgment of conviction. But we remand for the trial court to exercise its discretion whether to strike the five-year sentence enhancement under section 667, subdivision (a)(1),

---

[1]     *Faretta v. California* (1975) 422 U.S. 806, 819 (*Faretta*).

[2]     Further undesignated statutory references are to the Penal Code.

to strike the one-year sentence enhancements for the prison priors, and to allow Short to request a hearing and present evidence demonstrating his inability to pay the court assessments and restitution fines.

## BACKGROUND AND PROCEDURAL HISTORY

A. *The Amended Information*

The amended information charged Short with battery causing serious bodily injury (§§ 242, 243, subd. (d); count 1), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 3). As to counts 2 and 3, the amended information specially alleged Short personally inflicted great bodily injury (§ 12022.7, subd. (a)) and suffered a prior serious felony conviction (§ 667, subd. (a)(1)). As to all counts, the amended information specially alleged Short suffered a prior conviction of a violent or serious felony under the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and served three prior prison terms (§ 667.5, subd. (b)).

Short pleaded not guilty and denied the special allegations.

B. *The Evidence at Trial*

On August 24, 2016 Iesha Wilson was working as a cashier at a grocery store in Canoga Park. At approximately 3:15 p.m. Short approached Wilson at her cash register and attempted to return a package of ground turkey and milk using a store receipt. Wilson noticed the last four numbers of the store's club card on the receipt "were scribbled out," which she found "was a little suspicious." Wilson asked Short for his store club card, but he

3

did not have one.[3] Wilson contacted manager Morel So through the loud speaker. Wilson also called over another manager who was downstairs (Janie). Janie looked at the receipt and told Short he needed a club card to return the items. Janie took the items to the second floor office.

So, the manager responsible for the cashiers and baggers that day, was in the upstairs office.[4] Janie came into the office and stated, "He's back again." So looked at the security camera and saw Short in the front area of the store. So went downstairs and told Short, "You're not allowed in the store. You're trespassing. You need to leave, otherwise I'm going to call the cops." Short responded, "Why am I not supposed to be here? I want my shit back."

So went to the customer service desk to call the police. As So was calling, Short approached him from behind and punched him with a closed fist on the right side of his face.[5] So felt a "tremendous amount of pain on the right of [his] face." He felt ringing in his ears and his jaw bone "cracking." So could not see

---

[3] Wilson testified when a customer wants to return a store item, the cashier typically asks for the customer's store club card to match the last four numbers on the card with the numbers printed on the receipt.

[4] So first encountered Short five years earlier when So was a manager at another grocery store. Short stole from the store by placing items in his shopping cart and obtaining a cash refund without a receipt. On the occasions the store refused to give Short a refund, he left with the items without paying. So told Short two or three times he needed to leave the store or So would call the police.

[5] The prosecutor showed the video of the incident to the jury.

from his right eye, and he bled from his mouth.  So had to have two teeth extracted and two titanium plates and 11 titanium screws implanted in his face and jaw to repair the four fractures to the right side of his face.  As a result, So can no longer fully open his jaw.  In addition, So sometimes has blurry vision and ringing in his ears, and he feels sharp pain on the right side of his face.  As of the time of So's October 17, 2017 trial testimony, he had been unable to return to work because of his injuries.

After punching So, Short ran out of the grocery store and entered an athletic club that shared a parking lot with the grocery store.  Sales representative Melanie Fann interacted with Short after Short indicated he was interested in a club membership.  Fann observed Short was nervous and had a bleeding cut on his right knuckles.  Short filled out a guest registration form, including his name, but he picked up his bags and ran when an ambulance and police cars arrived outside the grocery store.  Short was arrested on December 12, 2016, after So identified him from a six-pack photographic lineup.

Short did not testify or call any witnesses.

C.    *The Verdicts and Sentences*

The jury found Short guilty on count 1 of battery causing serious bodily injury and on count 2 of assault by means of force likely to produce great bodily injury.  As to count 2, the jury found Short personally inflicted great bodily injury upon So (§ 12022.7, subd. (a)).  The jury was unable to reach a verdict on

count 3 for dissuading a witness by force or threat, and the trial court declared a mistrial as to that count.[6]

After a bifurcated court trial, the trial court found true Short suffered a conviction of a serious or violent felony under the three strikes law (assault with a deadly weapon).  The court also found true Short served three prior prison terms within the meaning of section 667.5, subdivision (b).

The trial court denied Short's motion for a new trial and his motion to strike his prior felony conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).  The court also denied Short's requests for a diagnostic evaluation under section 1203.03 and mental health diversion under section 1001.36.

The trial court sentenced Short to an aggregate term of 18 years in state prison.  On count 2 for assault by means of force likely to produce great bodily injury, the court sentenced Short to the upper term of four years, doubled to eight years under the three strikes law, plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), five years for the prior serious felony conviction (§ 667, subd. (a)(1)), and two years for two of the prior prison terms (§ 667.5, subd. (b)).  On count 1 for battery with serious bodily injury, the court imposed the upper term of four years, doubled to eight years under the three strikes law, but the court stayed the sentence pursuant to section 654.  The court imposed a $30 court facilities assessment (Gov. Code, § 70373) and a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)) on each count and a $300 restitution fine

---

[6]     The trial court later granted the People's motion to dismiss that count under section 1385.

(§ 1202.4, subd. (b)); and it imposed and suspended a $300 parole revocation restitution fine (§ 1202.45).  The court ordered Short to pay $22,888.72 in victim restitution to So by stipulation of the parties.  Short did not object to imposition of the assessments and fines or raise his inability to pay.

Short timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Revoking Short's Right To Represent Himself*

1. *The trial court proceedings*

On March 16, 2017 Short made a *Marsden*[7] motion to discharge his appointed attorney, which the trial court denied after a hearing.  Subsequently, defense counsel requested a continuance to prepare for trial.  Short stated, "If she's saying that she's going to waive time and I'm telling you for the record I'm not waiving time, then I'll go pro per then because I'm not waiving time, Your Honor."  The court continued the matter to April 6, 2017 for further pretrial proceedings.  On April 6, 2017 the parties announced they were ready for trial to commence on April 18, 2017.

At a hearing on April 12, 2017, Short made a *Faretta* motion to represent himself.[8]  In response to the court's inquiry, Short indicated he had represented himself in a prior criminal case and he knew the charges he faced.  He added, "I know

---

[7]     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[8]     Short requested a *Marsden* hearing, but in closed session he clarified that he sought to represent himself.

7

exactly what's going on and I'm not waiving any time, Your Honor." The court then inquired as to Short's mental condition. Short stated he had no history of mental illness and had never been hospitalized for a mental illness. He represented he had never taken psychotropic medication although he had been given a prescription in county jail for depression resulting from a death in his family. Short stated he was "mentally competent" with "no psychiatric problems." He also denied he had difficulty controlling his behavior in the prior criminal case.

The trial court asked Short, "Sir, you've told me on prior occasions there's lots of things that you expected to have your attorney do that weren't done. How are you going to get those things done if you are pro per and we're starting trial on [April] 18th?" Short responded, "I'm going to do it myself. [¶] I studied my case. I know how to let the jury know that [the People] don't have any evidence. I can do that myself. [¶] It's not a complex case when you don't have any medical reports, you don't have any pictures, you don't have any ambulance records, and the guy got on the stand and lied and said all this stuff." When defense counsel informed Short the prosecutor had just turned over the victim's medical records to the court, Short stated, "All, right I'll review those. I can review those. [¶] . . . I have a right to my discovery to see all the evidence that's used against me." Short added, "That's why I want to go pro per because I can review those medical records all over the weekend. I'll start trial on Tuesday."

The trial court stated it could not provide So's medical records to Short that day because the records had to be redacted to remove So's personal information. Short replied, "You don't have to turn them over to me today, that's fine. I'm ready to go to

trial." Short added, "So when it come trial, you all don't even need to have to show me the records. I'll ask the [prosecutor] to show the jurors the record, if that's how you all want to play, we can play it like that. [¶] . . . For the record, I'm not waiving any more time. I'm ready to go pro per and represent myself. So Tuesday for jury selection because I want to represent myself as pro per."

The trial court provided oral *Faretta* advisements to Short and reviewed the *Faretta* waiver form Short had signed. The court advised Short, "Your right to self-representation will be terminated by the court if you engage in any serious misconduct to obstruct the conduct and progress of the trial." The court granted the *Faretta* motion after finding Short had "voluntarily, knowingly and intelligently waived the right to be represented by an attorney with a full understanding of that right."

Later that day, the prosecutor provided to Short in court about 300 pages of So's redacted medical records relating to So's injuries from the incident, discovery, and still photographs of the video footage of the incident. Short inquired whether the medical records included the same records his attorney had shown him three weeks earlier reflecting that So had a preexisting condition of "prior syndromes" for which he had been admitted to the hospital. The prosecutor responded she did not know to what records Short was referring, noting she only took custody of the medical records at the last court date.

At this point Short stated, "For the record, I need to waive time because the syndrome is a preexisting condition and I need to subpoena [So's] medical records of all prior treatment pertaining to all his preexisting syndromes and his treatments for all these conditions that he was treated for after August 24th.

[¶]  And I request $60 in auxiliary funds to prepare adequate defense.  [¶]  I am asking for [$]500 for a private investigator to subpoena all his prior treatment, all his prior medical records of his preexisting condition."  The trial court responded, "Mr. Short, you made it abundantly clear this morning that you were ready for trial.  You did not want to waive time, you were ready to proceed on the 18th as we discussed.  I would not have allowed you pro per status."

The trial court asked Short what had changed since his refusal to waive time four hours earlier.  Short admitted he was aware of the medical records, but he needed "a doctor specialist to review the syndromes of the victim to verify . . . whatever he went to the hospital for, if it was the same as prior to this incident and to compare to see if it was because of me."  The court stated, "Mr. Short, if you need a continuance, I'm going to deny your right to represent yourself and I'm going to bring back counsel.  [¶]  . . . [¶]  . . . Nothing has changed that I can see between now and this morning."  Short replied, "Well, Your Honor, I just went over my case—I just talked to a few people that I know that know about law and they told me—let me know that I need to get a specialist because these medical records that you just gave to me are—due to the fact that he has prior syndrome or prior—a preexisting condition."[9]

The trial court stated to Short, "Either you are ready to represent yourself and proceed on Tuesday or I'm bringing back [defense counsel]."  Short stated he had a conflict with his defense attorney, again stating, "I want to represent myself and I

[9]      The trial court asked Short's attorney to address the medical records, and the attorney responded he had reviewed them and there was "no issue regarding preexisting conditions."

want to waive time because I need to get a private investigator." The court then revoked Short's self-represented status and reappointed defense counsel, subject to a *Marsden* hearing, stating Short had "misrepresented to the court [his] readiness to proceed to trial in pro per." The court explained, "I believe that you are playing games with the court, you are not ready to proceed, although just hours ago you told me you were not waiving time, you didn't need any further discovery, you were ready to go. [¶] Based upon those conditions that you represented to the court, I allowed you to represent yourself. [¶] After lunch you've changed your mind and want a lengthy continuance, a private investigator, an expert, and additional discovery."

    2.    *Governing law*

"The Sixth Amendment . . . grants to the accused personally the right to make his defense." (*Faretta, supra*, 422 U.S. at p. 819; accord, *People v. Trujeque* (2015) 61 Cal.4th 227, 262 (*Trujeque*) ["Under *Faretta*, a defendant 'must be free personally to decide whether in his particular case counsel is to his advantage,' even though 'he may conduct his own defense ultimately to his own detriment . . . .'"].) "A trial court may . . . revoke a defendant's right to represent himself if he 'deliberately engages in serious and obstructionist misconduct.'" (*Trujeque*, at p. 263, quoting *Faretta*, at p. 834, fn. 46; accord, *People v. Carson* (2005) 35 Cal.4th 1, 10 (*Carson*) ["Whenever 'deliberate dilatory or obstructive behavior' threatens to subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial [citation], the defendant's *Faretta* rights are subject to forfeiture."].)

11

"When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings.  One consideration is the availability and suitability of alternative sanctions. . . .  The court should also consider whether the defendant has been warned that particular misconduct will result in termination of in propria persona status.  [¶]  Additionally, the trial court may assess whether the defendant has 'intentionally sought to disrupt and delay his trial.' . . .  In many instances, such a purpose will suffice to order termination; but we do not hold that an intent to disrupt is a necessary condition. . . .  Ultimately, the relevance inheres in the effect of the misconduct on the trial proceedings, not the defendant's purpose." (*Carson, supra*, 35 Cal.4th at pp. 10-11, citations omitted.)

"On review, we accord 'due deference to the trial court's assessment of the defendant's motives and sincerity as well as the nature and context of his misconduct and its impact on the integrity of the trial in determining whether termination of *Faretta* rights is necessary to maintain the fairness of the proceedings.' [Citation.]  The court exercises considerable discretion in this regard and 'the exercise of that discretion "will not be disturbed in the absence of a strong showing of clear abuse."'" (*People v. Becerra* (2016) 63 Cal.4th 511, 518.)  The "'erroneous revocation of pro. per. status'" is reversible per se. (*Becerra*, at p. 520; accord, *People v. Butler* (2009) 47 Cal.4th 814, 825.)

### 3. *The trial court did not abuse its discretion*

Short acknowledges a trial court may condition the grant of an untimely *Faretta* motion on a defendant's ability to proceed immediately to trial. (*People v. Espinoza* (2016) 1 Cal.5th 61, 80; *People v. Valdez* (2004) 32 Cal.4th 73, 103.) But he contends the court should have denied his continuance request instead of revoking his self-represented status. (See *Espinoza*, at p. 81 [trial court did not abuse its discretion in denying defendant's midtrial request for a one-day continuance where defendant's self-represented status was conditioned on the trial proceeding within agreed upon time frame].) This contention lacks merit.

On April 6, 2017 the parties announced they would be ready for trial on April 18. Short made his *Faretta* motion four court days before trial,[10] at which time he stated he was not "waiving any more time" and would be ready to start trial the following Tuesday, April 18. When the trial court indicated it could not provide So's medical records to Short that day because it had to redact So's private information, Short responded, "You don't have to turn them over to me today, that's fine. I'm ready to go to trial." He added, "[Y]ou all don't even need to have to show me the records." Before the trial court granted the *Faretta* motion, it cautioned Short it would terminate his self-represented status if he "engage[d] in any serious misconduct to obstruct the conduct and progress of the trial."

Just four hours later, when the prosecutor provided So's redacted medical records to Short, Short requested a continuance to subpoena additional medical records, arguing he needed

---

[10] The April 12, 2017 hearing was on the Wednesday preceding the Tuesday, April 18 trial date.

information on So's purported preexisting "syndromes." The trial court responded that nothing had changed from Short's representations that morning. Contrary to Short's contention on appeal, the court advised Short of his options, explaining, "[I]f you need a continuance, I'm going to deny your right to represent yourself and I'm going to bring back counsel." Short still insisted on a continuance to retain an investigator and medical expert. Under these circumstances, the trial court did not abuse its discretion in revoking Short's self-represented status, concluding Short was intentionally "playing games with the court" by representing he would be ready for trial the following week so he could obtain self-represented status just four court days before trial, then four hours later claiming he needed a lengthy continuance to investigate the same medical records he earlier said he did not need to review. (*Trujeque, supra*, 61 Cal.4th at p. 263; *Carson, supra*, 35 Cal.4th at p. 10.)

B.    *Substantial Evidence Supports the Trial Court's Determination Short Was Competent To Stand Trial*
     1.    *The court declares a doubt as to Short's mental competency*

On April 12, 2017, after revoking Short's self-represented status, the court held a *Marsden* hearing. During the hearing defense counsel noted, "I've been battling back and forth in this matter because Mr. Short was evaluated by a psychiatrist or psychologist, not on my request but on my predecessor's request. The report did come back that he was incompetent." Defense counsel observed initially Short "comes across clear, cogent," but "as he goes along, there always seems to be that touch of paranoia or touch of lack of clarity, which hinders my ability to

14

adequately assist and advise him."  Short interjected, "No, I don't," and "I don't have any history."  Defense counsel continued, "So I'm really on the border as to whether to ask the court to declare a doubt in this matter."

After further discussion with Short and his attorney, the trial court stated to Short, "You are not making any sense to me. Your arguments are not cogent, not reasonable.  They are not supported by the facts as represented by your attorney and the knowledge that I have of this case.  I'm wondering about your competency."  The court denied Short's *Marsden* motion, at which time Short started yelling obscenities and called the judge a "stupid ass bitch."  Short was removed from the courtroom, and the court declared a doubt as to Short's mental competency.  The court explained, "The defendant's demonstrating paranoia, irrationality, he's in yellows, and apparently does have a history of a positive psychological evaluation and prior outbursts that I've been informed of.  Doubt is declared, proceedings are suspended."

      2.    *Dr. Edward Fischer's evaluation*

At the request of Short's prior attorney, the trial court appointed psychologist Dr. Edward Fischer to evaluate Short's competence to stand trial.  On March 17, 2017 Dr. Fischer interviewed Short for approximately two hours at the county jail. Dr. Fischer observed Short wore "the yellow clothing of [a] mental patient."  Short reported he was prescribed Risperdal[11] in county jail, but he refused to take the medication because he did

---

[11]    According to Dr. Fischer, Risperdal is "an antipsychotic medication appropriate to the treatment of paranoid schizophrenia."

not need it.  Short denied he had any mental illness.  In his April 6, 2017 report, Dr. Fischer found, "There was no definite evidence of a thought disorder, but [Short] did articulate both persecutory and grandiose statements that could be construed as delusions. . . .  He does appear to have a propensity for fighting with his peers.  His judgment is impaired and he lacks insight."

Dr. Fischer noted Short understood the charges and that he was subject to a sentence enhancement for his prior conviction for assault with a deadly weapon.  But Short "is unwilling or unable to work with anyone who disagrees with him, at least as long as he is not receiving appropriate antipsychotic medication."  Dr. Fischer observed, "[Short] was able to tolerate the interview with this examiner as long as he was not contradicted, but as soon as he came to believe that the examiner was not 100% behind him in his desire to abandon his attorney and represent himself, he was no longer able to rationally consider the opinions of this expert or his attorney that he was quite likely to lose his case if he attempted to represent himself without counsel."

Dr. Fischer concluded, "[Short] is not [c]ompetent to rationally assist his attorney and he is incapable of putting a rational defense to the charges without counsel as a result of his mental disorder, a paranoid syndrome that includes aspects of paranoid schizophrenia and paranoid personality disorder."  Dr. Fischer added, "It is medically appropriate to treat [Short's] psychiatric condition with medication.  Medication is likely to be effective.  The defendant does not have the capacity to make decisions about such medication.  If untreated with medication, [Short] will probably suffer serious harm to his physical and mental health.  [¶]  . . . Appropriate medication is likely to make [Short] competent to stand trial."

16

### 3. *Dr. Kory Knapke's evaluation*

The trial court also appointed psychiatrist Dr. Kory Knapke to evaluate Short's competency. Dr. Knapke attempted to interview Short on May 3 and June 7, 2017 at the county jail, but Short refused to talk with him. On both occasions, sheriff's deputies brought Short to speak with Dr. Knapke in a dayroom at the jail. Short appeared calm and relaxed and did not exhibit any bizarre or unusual behavior. Instead, Short asked Dr. Knapke why he wanted to speak with him, and after learning of the nature of the interview, Short calmly responded, "I'm not talking to you." Dr. Knapke spoke with a sheriff's deputy who was familiar with Short about Short's behavior in the county jail. Dr. Knapke reported the deputy "stated that [Short's] cell is always clean and that he does not exhibit any bizarre or unusual behaviors whatsoever. He also indicated that the defendant interacted with other inmates appropriately. He has not observed Mr. Short mumbling to himself or exhibiting any other psychotic behavior."

Dr. Knapke reviewed the preliminary hearing transcript from a 2014 criminal case in which Short represented himself.[12] Dr. Knapke observed Short did "an adequate job asking [a witness to the first offense] relevant questions for the most part." With respect to Short's cross examination of the victim of the second offense, Dr. Knapke found, "Mr. Short kept interrupting

---

[12]    In the 2014 criminal case, Short fled from a grocery store after stealing a beer can and punching a store display of potato chips. Short then went to a restaurant and demanded money from a customer. When the customer refused, Short punched him in the face and swung a chair at him.

17

him with objections that were overruled frequently. The court admonished the defendant about his outbursts during testimony and clearly had concerns about [Short] conforming his behavior with the dignity and decorum of the courtroom. However, I noticed that the defendant was not making any delusional comments and was not behaving in a way suggestive of a major mental illness." Dr. Knapke opined, "It became clear as I reviewed the preliminary hearing transcript when [Short] was representing himself that the defendant at the minimum understood the charge against him and understood basic courtroom proceedings, and there [were] no symptoms of a mental illness that were prohibiting him from understanding the charges and proceedings against him at that time."

According to Dr. Knapke, at the time of a January 2015 hearing in Short's 2014 criminal case, "Short was taking the antipsychotic medication Abilify twice a day," and Short reported he "had been taking the medication for five months." In that case, Short pleaded no contest to assault with a deadly weapon after the trial court found Short had expressly and intelligently waived his constitutional rights; his plea was free and voluntary; and he understood the charges and the consequences of the plea.

Dr. Knapke opined as to Dr. Fischer's conclusion in his report that Short may suffer from paranoid personality disorder or schizophrenia, "I saw no indication in Dr. Fischer's report that [Short] had any overt psychotic symptoms other than his general mistrust of the criminal justice system, which is a very common characteristic of most criminal defendants that I have examined in the county jail." Dr. Knapke also questioned whether Dr. Fischer, as a psychologist, could properly opine on whether it was medically appropriate to treat Short with medication or

18

conclude medication was likely to be effective in treating his mental illness.

Dr. Knapke reviewed discovery from the current case and "saw no documented psychotic symptoms." Dr. Knapke added, "Simply because a defendant has a difficult personality style and is opposed to having a public defender represent them does not necessarily render them incompetent. Because the defendant refused my clinical interview, I am unable to render an opinion as to whether he lacked capacity to rationally cooperate and assist his attorney if he chooses to do so. It appears that his unwillingness to cooperate with an attorney is volitional rather than based on any underlying psychiatric symptoms based upon the discovery I reviewed." Dr. Knapke concluded, "I am unable to overcome the presumption that [Short] is competent to stand trial. I had no clinical information provided to me, which would indicate that [Short] has been exhibiting psychotic symptoms or suffers from a diagnosis of [s]chizophrenia."

4.      *The competency hearing*

At the competency hearing, the parties submitted on the reports of Dr. Fischer and Dr. Knapke, the trial court's observation of Short while in court, the circumstances of the offenses, Short's criminal history, and the probation report. The trial court found Short failed to prove he was not competent to stand trial by a preponderance of the evidence. The court reasoned based on Dr. Knapke's report, "[Short] does not want any public defender, in my opinion, to be assigned to him who does not agree with his position of the case. [¶] His unwillingness or unhappiness in working with his public defender does not render him incompetent . . . . [¶] [Short]

19

would have to actually lack the capacity to rationally cooperate and assist his attorney to be found incompetent, which I do not find to be the case here. . . . [¶] It appears that [Short's] unwillingness to cooperate with his attorneys is a volitional act rather than based upon any underlying psychological pathology."

The court noted Short had adequately represented himself at the preliminary hearing in the 2014 case, and that although he became "argumentative and disruptive," he did not become "delusional." The court added that Short had taken Abilify and was prescribed Risperdal, but he refused to take his medication and did not receive any psychological treatment. The court noted Dr. Fischer was not a psychiatrist, and thus he was not qualified to opine about medication. The court added as to Short's behavior in jail that "he has not exhibited any bizarre or unusual behaviors. He interacts well and properly with the other inmates."

The trial court disagreed with Dr. Fischer's opinion Short was unable to cooperate with his attorney, finding it was Short's "reluctance to cooperate with his attorney[,] not his inability." The court observed, "[Short] gets extremely agitated to the court personnel and to this court when he doesn't get his way . . . . [¶] When his pro per [status] was revoked or his *Marsden* hearing gets denied, he yells and he actually spit at the court at the last proceeding, or if his public defender disagrees with him. [¶] He's loud, aggressive and shouts profanities to me. This is just malingering in his attempt to appear to be incompetent, which I do not find. [¶] . . . [¶] For all these reasons . . . , the court does find the defendant competent to stand trial within the meaning of [section] 1368."

20

5. *Governing law*

"The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he or she is mentally incompetent." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 385 (*Buenrostro*); accord, *People v. Mickel* (2016) 2 Cal.5th 181, 194-196 (*Mickel*); see § 1367, subd. (a) ["A person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent."].) "A defendant is incompetent to stand trial if the defendant lacks "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him."'" (*Mickel*, at p. 195; accord, *Buenrostro*, at p. 386; see § 1367, subd. (a) ["A defendant is mentally incompetent . . . if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."].)

"'[A] trial court is obligated to conduct a full competency hearing if substantial evidence raises a reasonable doubt that a criminal defendant may be incompetent.'" (*Buenrostro, supra*, 6 Cal.5th at p. 387; accord, *Mickel, supra*, 2 Cal.5th at p. 195.) After the trial court has declared a doubt as to a defendant's mental competency, section 1369, subdivision (a)(1), requires "[t]he court [to] appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant."

A defendant is presumed competent to stand trial. (*Buenrostro, supra*, 6 Cal.5th at p. 387; accord, *People v. Blacksher* (2011) 52 Cal.4th 769, 797 (*Blacksher*).) "When the defendant puts his or her competence to stand trial in issue, the

21

defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence." (*People v. Mendoza* (2016) 62 Cal.4th 856, 871; accord, *Buenrostro*, at p. 387.) "In reviewing on appeal a finding of competency, 'an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence.'" (*Blacksher*, at p. 797; accord, *Mendoza*, at p. 871.) "When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial." (*Mendoza*, at pp. 871-872; accord, *People v. Marks* (2003) 31 Cal.4th 197, 218, fn. 3.)

>    6.    *Short forfeited his challenge to Dr. Knapke's report, and substantial evidence supports the trial court's finding of mental competency*

Short contends there is insufficient evidence to support the trial court's finding he was competent to stand trial because the court relied on Dr. Knapke's evaluation, and Dr. Knapke did not personally examine Short. Short has forfeited this argument by submitting on the experts' reports and failing to object. (*Blacksher, supra*, 52 Cal.4th at p. 797 ["Because defendant submitted the question of his competency on [the psychiatrist's] report, he has forfeited the claims that the court abused its discretion by determining competency on the 'majority vote' of the experts or by relying on allegedly insufficient reports."]; *People v. Weaver* (2001) 26 Cal.4th 876, 904 ["Having submitted the competency determination on the two psychiatric reports, defendant may not now relitigate that question [of the effect of medication] with arguments he did not make below."]; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514 (*Kirvin*) ["[D]efendants

22

may not attack the validity of expert reports to which they submit with arguments they did not present to the trial court."].)

Even if Short had not forfeited his challenge to Dr. Knapke's report, his argument the court should not have relied on Dr. Knapke's report absent an in-person evaluation lacks merit. It was Short who refused to meet with Dr. Knapke on two occasions. A trial court "may rely upon a report not based on a face-to-face interview when the subject refuses to meet with the expert." (*Kirvin, supra*, 231 Cal.App.4th at p. 1514; accord, *People v. Hightower* (1996) 41 Cal.App.4th 1108, 1112 [experts' reports supported trial court's finding defendant was competent to stand trial even though "examination of [defendant] was limited by his refusal to participate"].)

Further, substantial evidence supports the trial court's finding of mental competency. Both Dr. Fischer and Dr. Knapke found Short understood the charges against him, and Short's self-representation in the 2014 criminal case showed he understood the criminal court proceedings. The experts disagreed on whether Short could rationally "assist counsel in the conduct of a defense" because of a mental health disorder. (§§ 1367, subd. (a), 1369, subd. (a)(2).) But the court was entitled to credit Dr. Knapke's finding there was no evidence of psychosis or delusions in the preliminary hearing transcripts in Short's 2014 criminal case or the discovery in the present case. (See *People v. Mendoza, supra*, 62 Cal.4th at p. 882 [in reviewing the sufficiency of the evidence for a competency finding, an appellate court does not substitute its judgment for that of the factfinder or reweigh the evidence]; *Kirvin, supra*, 231 Cal.App.4th at p. 1514 ["It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'"].)

In addition, when Dr. Knapke attempted to interview Short at the county jail, Short was calm and relaxed and did not exhibit any bizarre or unusual behavior, instead declining to talk with Dr. Knapke once he learned the nature of the interview. And, as Dr. Knapke noted, the sheriff's deputy at the county jail reported Short's cell at the county jail was "always clean" and Short did not "exhibit any bizarre or unusual behaviors whatsoever." Short interacted appropriately with other inmates, and he did not mumble to himself or exhibit any other psychotic behavior. As discussed, Dr. Knapke concluded based on this information and his review of the record that Short was competent to stand trial and his "unwillingness to cooperate with an attorney is volitional rather than based on any underlying psychiatric symptoms." We reject Short's argument the court erred in relying on Dr. Knapke's conclusion instead of that of Dr. Fischer. "The testimony of a single witness, if believed by the fact finder, is sufficient to prove any fact." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 530; accord, *Kirvin, supra*, 231 Cal.App.4th at p. 1514; see Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact."].)

Finally, the trial court properly relied in its own observations in court, noting Short becomes "extremely agitated . . . when he doesn't get his way," including when his self-represented status was revoked and his *Marsden* motion was denied. The court found Short's loud and aggressive behavior, including yelling obscenities at the court, was "just malingering in his attempt to appear to be incompetent, which I do not find." Further, "[v]oluntary barriers to communication with counsel on the part of a defendant who was able to cooperate do not

24

demonstrate incompetence." (*People v. Mendoza, supra*, 62 Cal.4th at p. 879; accord, *People v. Mai* (2013) 57 Cal.4th 986, 1034 ["[A]n uncooperative attitude is not, in and of itself, substantial evidence of incompetence."]; *People v. Medina* (1995) 11 Cal.4th 694, 735 ["[d]efendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his competence to do so"]; *People v. Hightower, supra*, 41 Cal.App.4th at p. 1112 ["[Defendant] asserts that his disruptive behavior in the courtroom and disputes with defense counsel prove that he was not competent to stand trial. His conduct demonstrates an unwillingness to cooperate with defense counsel but does not constitute proof of mental incompetence."].)

C.    *The Trial Court Did Not Err in Denying Short's Request for Mental Health Diversion*

1.    *Short's request for mental health diversion*

At sentencing, defense counsel requested the trial court grant Short mental health diversion pursuant to section 1001.36, arguing Short suffered from schizophrenia and he was hospitalized in 2011 because he was delusional and aggressive.[13]

---

[13]    Short relied on his medical records from his May 3 to 10, 2011 hospitalization at Olive View UCLA Medical Center. According to a May 4, 2011 medical note, Short was homeless and sleeping in the hospital lobby when security told him to leave. Short was placed on a psychiatric hold because he "was disorganized with grandiose delusion including that he was a boxer that put a famous boxer into retirement"; "he wanted to hurt all black women and get high until he died"; and he had "affective flattening and paranoid delusions consistent with

Defense counsel claimed Short was willing to be treated for his mental health disorder.  She also argued that despite Short's lengthy criminal record and a conviction for assault with a deadly weapon, he was not a violent person.

The trial court denied Short's request on multiple grounds. As a threshold matter, the court observed section 1001.36 provided for "pre-conviction diversion."  However, the court then proceeded to consider the factors applicable to mental health diversion.  The court relied on Dr. Knapke's opinion there "was no clinical basis to support that the defendant had a major mental illness or disorder"; Short denied any history of a mental illness or disorder; and Short did not exhibit any bizarre or unusual behavior while he was in jail.  The court also found any mental disorder Short suffered from did not play a significant role in the charged offense.  The court explained, "There's no report that I'm aware of that shows that his schizophrenia or any other mental illness played a significant role in the defense in this case.  He was simply stealing and then hitting the manager to avoid being arrested.  He could have simply walked out the store.  [¶]  Based on [the store's] policy, he never would have even been chased down or arrested probably, but he chose instead to assault the manager, in my opinion, out of revenge for the manager threatening or telling him to leave and threatening to call the police."  The court further found, "There's no treatment plan in place that would address his mental health issues or

_____

schizophrenia."  After Short was given notice of the hold, "he banged doors and cussed at people, exposed himself and urinated in the hallway and threw milk and juice on the floor."  At the time of his May 10, 2011 discharge, Short was diagnosed with schizoaffective disorder, bipolar type.

prevent him from engaging in future criminal conduct, . . . and I think he represents a substantial threat to the safety of the community."

Defense counsel then requested the trial court consider and mark as an exhibit Short's medical records.[14] The court asked, "What are the records going to tell me that we haven't received from Dr. Fischer and Dr. Knapke?" Defense counsel responded Short's medical records show he was diagnosed with schizoaffective disorder and had been prescribed Abilify, and the records would provide "a full picture of what he suffers from." The court replied, "Well, as I mentioned earlier, he doesn't fit within the six criteria even if it is applicable to him post conviction. And we know he has a history of mental illness and I think you are just proving my point. [¶] He's been hospitalized extensively. He's been examined multiple times. He's been prescribed psychotropic drugs, which he refused to take, and has not been deterred from his criminal behavior. His criminal conduct is continuous."

_____

[14] The medical records included his 2011 records from Olive View UCLA Medical Center and records from a 2014 outpatient visit in which Short sought "medication for mood and anxiety." The 2014 notes indicate Short did not exhibit paranoia, and he denied any mania. Short also submitted medical records from 2015 and 2016 reflecting outpatient visits for infections and back pain. The records consistently describe Short's condition as not consistent with a mental disorder. During a 2015 outpatient visit for back pain, the notes reflect Short was "welcome" to visit the psychiatry department to discuss his mental health issues, but the records do not show Short followed up. In addition, Short's list of medications in the 2015 and 2016 records did not include any psychotropic medications.

The prosecutor objected to Short's request for a mental health diversion order, arguing Short was "sophisticated and calculated," lashing out at the court whenever he was confronted with authority or denied relief.  The court declined to review the medical records, finding the records would not make a difference in the court's decision.  At the request of defense counsel, the court admitted Short's mental health records "for purposes of review on appeal if so allowed."

2.    *Governing law*

Effective June 27, 2018, "the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.) . . . .  [Citation.]  Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (§ 1001.36, subd. (a).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).)  "The stated purpose of the diversion statute 'is to promote all of the following:  [¶]  (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶]  (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶]  (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.'  (§ 1001.35, subds. (a)-(c).)" (*Ibid*.)

Under section 1001.36, subdivision (c), "'pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point

28

at which the accused is charged until adjudication . . . ." If a defendant is charged with qualifying offenses,[15] "a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*Frahs, supra*, 9 Cal.5th at pp. 626-627; accord, *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1115, fn. 13; see § 1001.36, subd. (b)(1)(A)-(F).)

If all six criteria in section 1001.36, subdivision (b)(1), are met, and if the trial court "is satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (*id.*, subd. (c)(1)(A)), then the trial court may order pretrial diversion into an approved mental health treatment program for up to two years (*id.*, subd. (c)(1), (3)). If the defendant commits an additional offense or otherwise performs unsatisfactorily in the diversion program, the trial court may reinstate the criminal proceedings. (*Id.*, subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).)

---

[15] A defendant may not be placed into a diversion program for murder, manslaughter, use of a weapon of mass destruction, or certain enumerated sex offenses. (§ 1001.36, subd. (b)(2).)

Upon successful completion of diversion, "the arrest upon which the diversion was based shall be deemed never to have occurred . . . ."  (*Ibid*.; accord, *Frahs, supra*, 9 Cal.5th at p. 627.)

Short contends, and we agree, section 1001.36 applies retroactively to Short's case even though the question of diversion arose postconviction.  (*Frahs, supra*, 9 Cal.5th at pp. 624-625.)  As the *Frahs* court observed, section 1001.36 "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.)  We review the trial court's decision whether to grant mental health diversion for an abuse of discretion.  (See *id.* at p. 626 ["Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders.  (§ 1001.36, subd. (a).)"].)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Short argues a limited remand is appropriate to allow the trial court to conduct a mental health diversion eligibility hearing in light of Short's medical records, which show Short had been diagnosed as a paranoid schizophrenic, contrary to Dr. Knapke's opinion he was not currently suffering from a mental disorder.  The trial court did not abuse its discretion.  Although the court declined to review Short's medical records, it acknowledged Short suffered from a qualifying mental disorder, stating Short "has a history of mental illness" and had been "hospitalized extensively."  As the court stated in denying Short's *Romero* motion, "He has a history of mental illness.  He was diagnosed with schizophrenia in 2011."  (See § 1001.36, subd. (b)(1)(A) [mental disorder includes schizophrenia and schizoaffective disorder].)

30

Instead, the trial court concluded Short did not meet three of the six requirements for eligibility for mental health diversion. As to the second statutory requirement, the trial court stated there was no report showing Short's schizophrenia or any other mental illness played a significant role in the commission of the offense. (See § 1001.36, subd. (b)(1)(A), (B).) Short has not pointed to evidence to the contrary. As to the third requirement, the court found there was "no treatment plan in place that would address his mental health issues or prevent him from engaging in future criminal conduct." (*Id.*, subd. (b)(1)(C).) Although Dr. Fischer opined that medication would address Short's mental illness, Short did not present evidence of a treatment plan, and Short had refused to take medication doctors had previously prescribed for him. As to the sixth requirement, the court determined Short represented "a substantial threat to the safety of the community." (*Id.*, subd. (b)(1)(F).) Although the court did not provide further detail, in the context of sentencing, the court found Short was "a clear and present danger to the community" based on his violent conduct during the incident and his prior offenses of increasing seriousness.

D.  *Remand Is Appropriate for the Trial Court To Exercise Its Discretion Whether To Strike the Five-year Enhancement Under Section 667, Subdivision (a)(1)*

In 2018 the Governor signed into law Senate Bill No. 1393 (2017-2018 Reg. Sess.), which went into effect on January 1, 2019. Senate Bill No. 1393 amended section 1385 by deleting subdivision (b), which prohibited trial courts from exercising discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under [s]ection 667."

31

(§ 1385, former subd. (b).)  As the People concede, Senate Bill No. 1393 applies retroactively to Short because his sentence was not final at the time the new law became effective on January 1, 2019.  (*People v. Stamps* (2020) 9 Cal.5th 685, 699; *People v. Jones* (2019) 32 Cal.App.5th 267, 272; see *In re Estrada* (1965) 63 Cal.2d 740, 744 [Absent contrary legislative intent, "[i]f the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies."].)

"Remand is required unless 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] enhancement' even if it had the discretion."  (*People v. Franks* (2019) 35 Cal.App.5th 883, 892; accord, *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1081 [remand is required when "the record does not 'clearly indicate' the court would not have exercised discretion to strike the firearm allegations had the court known it had that discretion"]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [same].)  "In reviewing whether the trial court made such an unequivocal indication, we consider the trial court's statements and sentencing decisions."  (*Franks*, at p. 892.)

Short contends remand is appropriate for the trial court to exercise its discretion whether to strike the prior serious felony conviction enhancement imposed pursuant to section 667, subdivision (a)(1).  The People respond the trial court's statements at sentencing show it would not have stricken the five-year enhancement even if it had the discretion to do so.  Short has the better argument.

At the time Short was sentenced on October 16, 2018, the five-year enhancement for a prior serious felony conviction was mandatory.  (§ 1385, former subd. (b).)  The People point to statements made by the trial court finding aggravating factors and no mitigating factors.  The trial court stated, "My tentative sentence is 18 years, which I planned to give him all along."  The court explained, "The crime involved great violence, disclosing a high degree of cruelty, viciousness and callousness."  The court noted the victim suffered serious injuries and was vulnerable because he had his back turned to Short when Short attacked him without any warning.  The court also found, "[Short] has engaged in violent conduct that indicates a serious danger to society.  [¶]  The defendant inflicted great bodily injury and risked killing the victim just to avoid being arrested for attempted petty theft."  The court noted Short's "record spans seven years reflecting multiple convictions for crimes such as drug possession, theft, burglary, assault with a deadly weapon, and battery conviction," and Short's "prior performance on probation" was "unsatisfactory."  The court added, "The defendant is erratic, his criminal conduct continuous[,] frequent and increasing in seriousness, and he does not appear amenable to treatment in an outpatient setting.  He is a clear and present danger to the community."

Although the trial court emphasized Short's vicious and callous conduct that supported both denial of his *Romero* motion and imposition of the upper term on counts 1 and 2, this does not provide a clear indication the court would have declined to strike the five-year sentence enhancement under section 667, subdivision (a)(1), if it had the discretion to do so, especially given the significant 11-year sentence Short would still face on remand

33

absent the five-year enhancement. (See *People v. Bell* (2020) 47 Cal.App.5th 153, 200 ["As for the court's statement about [defendant's] *Romero* motion, it is only a 'clear indication' of its views on *that particular* sentencing decision. We cannot speculate from the court's statements and decision as to one sentencing issue to divine what the court would have done if it had broadened discretion on another sentencing issue."]; *People v. McDaniels, supra*, 22 Cal.App.5th at p. 427 ["Given these high stakes, it seems to us that a reviewing court has all the more reason to allow the trial court to decide in the first instance whether these enhancements should be stricken, even when the reviewing court considers it reasonably probable that the sentence will not be modified on remand."].)

*People v. Jones*, *supra*, 32 Cal.App.5th at page 272, relied on by the People, is distinguishable. The Court of Appeal in *Jones* concluded "the trial court made clear its intention to impose the most stringent sentence it could justifiably impose," noting the "defendant's actions were premeditated, dangerous, senseless and absurd, . . . and the court took 'great satisfaction' in imposing the 'very lengthy sentence' it imposed." (*Id.* at pp. 274-275; see *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [declining to remand for resentencing because there was no possibility the trial court would strike the firearm enhancement on remand where it explained in imposing the upper term on the enhancement, "'[T]his is as aggravated as personal use of a firearm gets,' and 'the high term of 10 years on the enhancement is the only appropriate sentence on the enhancement'"].) Although the trial court here expressed its view Short's conduct was vicious and callous, it did not make the type of statements the *Jones* and *McVey* trial courts made that provided a clear

34

indication the courts would not have stricken the five-year enhancement even if they had the discretion to do so. We therefore remand for resentencing to afford Short a "'"sentencing decision[] made in the exercise of the 'informed discretion' of the sentencing court."'" (*People v. Billingsley, supra*, 22 Cal.App.5th at p. 1081; accord, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

E.  *The Two 1-Year Prior Prison Term Enhancements Must Be Stricken*

Short argues, the People concede, and we agree both one-year enhancements under section 667.5, subdivision (b), must be stricken. Effective January 1, 2020, Senate Bill No. 136 (2019-2020 Reg. Sess.) amended section 667.5, subdivision (b), to provide for a one-year prior prison term sentence enhancement only for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b). (*People v. Matthews* (2020) 47 Cal.App.5th 857, 862; *People v. Gastelum* (2020) 45 Cal.App.5th 757, 772; *People v. Jennings* (2019) 42 Cal.App.5th 664, 681.) Senate Bill No. 136 applies retroactively to Short because his sentence was not final at the time the new law became effective on January 1, 2020. (*People v. Winn* (2020) 44 Cal.App.5th 859, 872 ["Because [defendant's] conviction is not yet final, he is entitled to the retroactive benefit of the change in law."]; J*ennings*, at p. 682 ["Senate Bill No. 136's amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020, effective date."]; see *In re Estrada, supra*, 63 Cal.2d at pp. 744-745.)

None of Short's prior convictions was for a sexually violent offense; thus, the section 667.5, subdivision (b) enhancements

must be stricken.  (*People v. Smith* (2020) 46 Cal.App.5th 375, 396; *People v. Gastelum, supra*, 45 Cal.App.5th at p. 772.)

F.      *On Remand Short Is Entitled To Request an Ability-to-pay Hearing on the Fines and Assessments Imposed by the Trial Court*

Short contends he is entitled to an ability-to-pay hearing as to the $60 in court facilities assessments, $80 in court operation assessments, $300 restitution fine, and parole revocation restitution fine in the same amount, relying on this court's opinion in *Dueñas, supra*, 30 Cal.App.5th 1157.[16]  We agree Short is entitled to request a hearing upon remand to the trial court.

1.      Dueñas *and its progeny*

In *Dueñas*, this court concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California

---

[16]     To the extent Short contends he is entitled to an ability-to-pay hearing on the $22,888.72 victim restitution order, he is incorrect.  The trial court ordered Short to pay restitution to So pursuant to section 1202.4, subdivision (f)(3).  "*Dueñas* does not apply to victim restitution under section 1202.4, subdivision (f)." (*People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; accord, *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["a defendant's ability to pay victim restitution is not a proper factor to consider in setting a restitution award under section 1202.4, subdivision (f)"].)

Constitution." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168; accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655 (*Belloso*), review granted Mar. 11, 2020, S259755.)[17]  In contrast to court assessments, a restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas*, at p. 1169; accord, *Belloso*, at p. 655.)  Section 1202.4, subdivision (c), expressly provides a defendant's inability to pay a restitution fine may not be

[17]    Several Courts of Appeal have applied this court's analysis in *Dueñas* (e.g., *People v. Santos* (2019) 38 Cal.App.5th 923, 929-934; *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted Nov. 13, 2019, S257844 [applying due process analysis to court assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035), or partially followed *Dueñas* (e.g., *People v. Valles* (2020) 49 Cal.App.5th 156, 162-163, review granted July 22, 2020, S262757 [concluding due process requires ability-to-pay hearing before imposition of court facilities fee, not restitution fines]).  Other courts have rejected this court's due process analysis (e.g., *People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946), or concluded the imposition of fines and fees should be analyzed under the excessive fines clause of the Eighth Amendment (e.g., *People v. Cowan* (2020) 47 Cal.App.5th 32, 42, review granted June 17, 2020, S261952; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061; *Kopp*, at pp. 96-97 [applying excessive fines analysis to restitution fines]).  The Supreme Court granted review of the decision in *Kopp* to decide the following issues: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  If so, which party bears the burden of proof regarding defendant's inability to pay?" (Supreme Ct. Minutes, Nov. 13, 2019, p. 1622; see *Kopp, supra*, 38 Cal.App.5th 47.)

considered as a "compelling and extraordinary reason" not to impose the statutory minimum fine. However, as this court held in *Dueñas*, to avoid the serious constitutional questions raised by imposition of a restitution fine on an indigent defendant, "although the trial court is required by . . . section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, at p. 1172; accord, *Belloso*, at p. 655.)

In *Belloso* we rejected the argument the People make here that "a constitutional challenge to imposition of fines and fees on an indigent defendant should be analyzed under an excessive fines analysis instead of a due process framework." (*Belloso, supra*, 42 Cal.App.5th at p. 660.) We observed, "As the California Supreme Court explained in [*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728], in its analysis of the constitutionality of civil penalties imposed by the trial court, 'It makes no difference whether we examine the issue as an excessive fine or a violation of due process.'" (*Ibid*.)

2. *Short did not forfeit his challenge to the imposition of the assessments and fees*

The People contend Short forfeited his challenge to imposition of the assessments and fines because he did not assert his inability to pay at sentencing. However, at the time Short was sentenced, *Dueñas* had not yet been decided, and we have declined to find forfeiture based on a defendant's failure to object to fines and fees prior to our opinion in *Dueñas*. As we explained in *People v. Castellano* (2019) 33 Cal.App.5th 485, 489, "[N]o California court prior to *Dueñas* had held it was unconstitutional

to impose fines, fees or assessments without a determination of the defendant's ability to pay. . . . When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture." (Accord, *Belloso, supra*, 42 Cal.App.5th at p. 662; *People v. Santos* (2019) 38 Cal.App.5th 923, 931-932; *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138; contra, *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464 [defendant forfeited challenge by not objecting to the assessments and restitution fine at sentencing]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1154 [same].)

In light of Short's burden to prove his inability to pay (*People v. Castellano, supra*, 33 Cal.App.5th at p. 490), on remand the trial court must afford Short an opportunity to request an ability-to-pay hearing and to present evidence of his inability to pay the assessments and fines.[18]

## DISPOSITION

The judgment of conviction is affirmed. We remand for the trial court to exercise its discretion whether to strike the five-year sentence enhancement under section 667, subdivision (a)(1) and to allow Short to request a hearing and present evidence demonstrating his inability to pay the court assessments and restitution fines.

---

[18] We note the only evidence in the record as to Short's ability to pay is the statement in the probation report that Short was unemployed.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.